UNITED STATES, Appellee

v.

Stephanie R. TRAUM, Senior Airman
U.S. Air Force, Appellant

No. 02-0885

Crim. App. No. 34225

United States Court of Appeals for the Armed Forces

Argued October 21, 2003

Decided August 24, 2004

BAKER, J., delivered the opinion of the Court in which CRAWFORD,
C.J., joined. GIERKE, J., filed an opinion concurring in part
and in the result which EFFRON, J., joined. ERDMANN, J., filed
a separate opinion concurring in part and in the result.

Counsel

For Appellant: Lieutenant Colonel Craig S. Cook (argued);
    Colonel Beverly B. Knott, Major Terry L. McElyea, and Captain
    Kyle R. Jacobson (on brief); Captain Antony B. Kolenc.

For Appellee: Captain C. Taylor Smith (argued); Colonel LeEllen
    Coacher and Major John D. Douglas (on brief); Lieutenant
    Colonel Robert V. Combs, Lieutenant Colonel Lance B. Sigmon,
    Major Shannon J. Kennedy, and Major Jennifer R. Rider.

Military Judge: B. T. Brown

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE PUBLICATION.**

Judge BAKER delivered the opinion of the Court.

On September 17, 1999, contrary to her plea, Appellant was convicted by general court-martial of the premeditated murder of her infant daughter in violation of Article 118, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 918 (2000). The sentence, adjudged by a panel of officer and enlisted members, provided for a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, a reprimand, and reduction to the lowest enlisted grade. Except for the reprimand, the convening authority approved the sentence as adjudged. The Air Force Court of Criminal Appeals affirmed the approved findings and sentence in an unpublished opinion. United States v. Traum, No. ACM 34225, slip op. (A.F. Ct. Crim. App. June 28, 2002). We granted review to determine whether Appellant's confession to Air Force Office of Special Investigations (AFOSI) investigators should have been suppressed, and whether the military judge allowed the Government's expert witness to present inadmissible profile evidence against Appellant.[1] For the reasons that follow, we affirm.

---

[1] The granted issues are:

> I. WHETHER APPELLANT'S STATEMENTS TO SPECIAL AGENT
>    KRAUS SHOULD HAVE BEEN SUPPRESSED BECAUSE:

I

The Confession of January 13

On the morning of December 21, 1998, base emergency medical personnel received a phone call from Appellant indicating that her eighteen-month old daughter Caitlyn was not breathing. During the call, Appellant suggested that the child might be having a seizure. Minutes later, medical personnel arrived at Appellant's quarters and began to treat the unresponsive child. The child was transported by ambulance to the hospital where efforts to revive her continued. Despite the efforts of

A. THE REQUEST BY AGENTS OF THE AFOSI THAT APPELLANT SUBMIT TO A POLYGRAPH EXAMINATION CONVERTED THEIR DISCUSSION INTO OFFICIAL QUESTIONING DURING WHICH APPELLANT COULD INVOKE HER RIGHT TO REMAIN SILENT; AND

B. APPELLANT'S STATEMENT THAT SHE DID NOT WISH TO DISCUSS THE EVENTS OF THE NIGHT HER DAUGHTER DIED WAS AN INVOCATION OF HER RIGHT TO REMAIN SILENT, THUS REQUIRING THAT THE AFOSI AGENTS SCRUPULOUSLY HONOR HER REQUEST TO REMAIN SILENT.

II. WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY ALLOWING THE PROSECUTION EXPERT WITNESS, DR. COOPER, TO TESTIFY AS TO INADMISSIBLE STATISTICAL PROFILE EVIDENCE AND TO VOICE A MEDICAL OPINION OF HOMICIDE LARGELY BASED UPON APPELLANT'S CONDUCT.

III. WHETHER THIS COURT SHOULD ORDER NEW POST-TRIAL PROCESSING WHERE THE STAFF JUDGE ADVOCATE'S RECOMMENDATION INCORRECTLY ADVISED THE CONVENING AUTHORITY ON THE MAXIMUM AUTHORIZED PUNISHMENT.

This third issue is resolved against Appellant in summary fashion at the end of this opinion.

hospital personnel, Caitlyn was pronounced dead shortly after arriving at the emergency room.  Appellant was home alone with the child at the time the emergency call was made.

In the weeks following the child's death, AFOSI investigators focused on Appellant as a homicide suspect.  On January 12, 1999, Appellant called AFOSI to inquire about the status of the investigation of her daughter's death.  The agents expressed a desire to discuss the investigation with Appellant at their office and she agreed to meet with them the following morning.

When Appellant arrived at the AFOSI office on the morning of January 13, she met with Special Agents (SA) Engelman and Gage and requested an update on the investigation.  Appellant also informed them that she needed a copy of her daughter's autopsy report and death certificate in order to process her humanitarian reassignment.  After further "idle chit chat," SA Engelman asked Appellant if she would be willing to take a polygraph. At first, Appellant neither declined nor accepted the invitation to take the polygraph.  SA Engelman explained to Appellant that a possible benefit of taking the examination might be to rule her out as a suspect.

When asked again whether she was willing to take the examination, Appellant replied that "she did not want to talk about the details of the night of 20/21 December 1998."  SA

Engelman subsequently explained to Appellant that it might not be necessary to go into all of the details of that night, but it might be necessary to go into some of the details. The agent further explained that if Appellant still had concerns with talking about the details of that night, she could raise them with the polygrapher, SA Kraus. Appellant acknowledged that she understood this information.

Following this discussion, Appellant accompanied SA Kraus into a room to be interviewed and polygraphed. Prior to asking any questions, SA Kraus administered Appellant's Article 31 rights and advisement. He also informed Appellant that she was not required to take the examination. Appellant waived these rights and agreed to be polygraphed and interviewed. There is no indication that at any time after the rights advisement, Appellant expressed her earlier concerns about discussing the details of the night of December 20 or the morning of December 21 to SA Kraus or anyone else.

After the polygraph examination, SA Kraus interviewed Appellant. During this interview, Appellant disclosed that she had killed Caitlyn by pushing the child's head into the couch and suffocating her. Appellant reduced this confession to writing and signed it. This written statement recounts that Appellant "gently pressed Cait's head into the couch" ostensibly to save Caitlyn from her father's abusive ways. Appellant

included in her statement that she decided to take the child's life "around midnight on the 20 or 21st Dec. 98." When asked why she smothered the child as opposed to killing her in some other way, Appellant's written response was, "I didn't want her to hurt." At the time of the AFOSI interview, Appellant was a married, 25 year old E-4 with 6 1/2 years of service.

Prior to the trial on the merits, Appellant moved to suppress her confession to SA Kraus. In her motion, Appellant initially contended that because she was a suspect on the morning of January 13, her Article 31 rights should have been read prior to the agents engaging in any conversation with her. For the purposes of this appeal, Appellant has narrowed her claim to an assertion that SA Engelman's question regarding taking a polygraph was designed to elicit an incriminating response. Therefore, according to Appellant, SA Engelman was required to warn her of her Article 31 rights before asking this question. Appellant also contends, as she did at trial, that her response to SA Engelman's question that "she did not want to talk about the details of the night of 20/21 December 1998" was an invocation of her Fifth Amendment right to remain silent. Further, Appellant asserts that her invocation was unequivocal and not honored, therefore, any statement taken after Appellant's response to SA Engelman's question regarding the examination was tainted and should have been suppressed.

6

A.  The Requirement to Warn under Article 31

Appellant asserts that the agent's request for her to take a polygraph was either interrogation or a request for a statement within the meaning of Article 31.

No person subject to the UCMJ may "interrogate, or request any statement" from a person suspected of an offense without first warning that person in accordance with Article 31(b). Article 31(b), UCMJ, 10 U.S.C. § 831 (2000).  "'Interrogation' includes any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning."  Military Rule of Evidence 305(b)(2)[hereinafter M.R.E.]; Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  M.R.E. 305(b)(2) was broadly fashioned "to thwart 'attempts to circumvent warnings requirements through subtle conversations.'"  United States v. Ruiz, 54 M.J. 138, 141 (C.A.A.F. 2000)(quoting S. Saltzberg et al., Military Rules of Evidence Manual 225 (4th ed. 1997)).  However, interrogation involves more than merely putting questions to an individual. Id.

We recognize that a request to take a polygraph may arise in a variety of circumstances related to interrogation.  See Wyrick v. Fields, 459 U.S. 42 (1982); United States v.

7

Applewhite, 23 M.J. 196 (C.M.A. 1987).[2]  In each instance, the question will be whether an incriminating response is sought or is the reasonable consequence of the comment or remark.  Of course, a rights advisement prior to such a question would remove the necessity for such analysis.  Based on the context in which SA Engelman asked Appellant whether she would take a polygraph, we conclude that an incriminating response was not a reasonable consequence of SA Engelman's inquiry.  In our view, the "reasonable consequence" of SA Engelman's question in the context presented was either yes or no.  Similarly, we agree with the conclusion reached by the Court of Criminal Appeals

---

[2]  Each of these cases can be distinguished from the present case.  Both involved the custodial interrogation of individuals who had previously invoked their right to counsel.  In Wyrick, the Supreme Court reasoned that by requesting to take a polygraph the defendant had "intiate[d] dialogue with the authorities" such that interrogation could resume.  Wyrick v. Fields, 459 U.S. 42, 48 (1982).  In Applewhite, the focus was on whether a previous invocation of the right to counsel had been honored or whether it had been undermined.  There, the accused requested counsel, but investigators asked the accused to take a polygraph. Several days later he appeared prepared to do so.  Prior to the examination he was confronted with new as well as previous allegations of wrongdoing.  Whatever dicta may have been used in resolving the issue in that case, there was no holding that the mere request to take the polygraph was intended to elicit an incriminating response.  Rather, in the words of Judge Cox, "After appellant invoked his right to counsel, the investigator sought to circumvent the exercise of that right by requesting appellant to take a polygraph examination."  United States v. Applewhite, 23 M.J. 196, 199 (C.M.A. 1987).  Interrogation of Applewhite occurred when he returned several days later to actually take the examination.  Id.  Significantly, Appellant in this case was neither in custody nor had she invoked her right to counsel.

8

that "[n]o incriminating response from the appellant was sought . . . ." Traum, No. ACM 34225, slip op. at 4. The polygraph and its operator were located in an adjacent room. SA Engelman's objective was to encourage Appellant to take the polygraph not to ask questions that might serve as an investigative substitute for what the agents hoped to garner from the administration of the polygraph exam. Thus, we conclude that an incriminating response was neither sought nor was it a reasonable consequence of SA Engelman's inquiry.

B. Right to remain silent

We next determine whether Appellant's response to SA Engelman's question was an invocation of her right to silence, and if so, whether that right was "scrupulously honored." See Miranda v. Arizona, 384 U.S. 436, 479 (1966). While SA Engelman's question was not interrogation as measured under Article 31, Appellant could nonetheless invoke her Fifth Amendment right to silence in response to the question. The right to remain silent "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Kastigar v. United States, 406 U.S. 441, 444-45 (1972). "[A]pplication of the privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime."

9

United States v. Traum, No. 02-0885/AF

United States v. Alameda, 57 M.J. 190, 199 (C.A.A.F. 2002). See also Combs v. Coyle, 205 F.3d 269, 283 (6th Cir. 2000); United States v. Brunson, 952 F.2d 1196, 1201 (10th Cir. 1991), cert. denied, 503 U.S. 997 (1992); Coppola v. Powell, 878 F.2d 1562, 1568 (1st Cir. 1989), cert. denied, 493 U.S. 969 (1989); United States ex rel. Savory v. Lane, 832 F.2d 1011, 1017 (7th Cir. 1987).

This Court has established that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease[.]" United States v. Sager, 36 M.J. 137, 145 (C.M.A. 1992)(quoting Miranda, 384 U.S. at 473). This important principle is incorporated in the Manual for Courts-Martial as well. "If a person chooses to exercise the privilege against self-incrimination . . . questioning must cease immediately." M.R.E. 305(f)(1). Although no particular words or actions are required to exercise one's Fifth Amendment right to silence, we have held that its invocation must be unequivocal before all questioning must stop. Sager, 36 M.J. at 145; see United States v. Schake, 30 M.J. 314, 319 (C.M.A. 1990); see also Campaneria v. Reid, 891 F.2d 1014, 1021 (2d Cir. 1989), cert denied, 499 U.S. 949 (1991).

Appellant's response that "she did not want to talk about the details of the night of 20/21 December 1998" did not

10

foreclose the possibility that she was willing to take the polygraph and discuss other aspects of the investigation, such as the child's medical history or the manner in which Appellant cared for her child.  Thus, Appellant's words did not unequivocally invoke her right to remain silent.

SA Engelman, who was not assigned to administer the polygraph, informed Appellant that she might not have to talk about all the details of that night, but that she was free to raise her concerns with the individual administering the examination.  The military judge found Appellant understood this advice.  Later at the interview with SA Kraus, Appellant had the opportunity to do as SA Engelman had advised.  Instead, Appellant voluntarily decided to take the examination.  This decision was made after being informed of, and waiving, her right to counsel and her right to remain silent, as well as after being informed of her right to refuse the polygraph examination.  Based on these facts, the military judge concluded that Appellant made an informed decision to waive her rights before making any admissions to SA Kraus and that her statement was voluntary.  We agree.  Therefore, the military judge did not abuse his discretion in admitting Appellant's confession.

II

Expert Testimony at Trial

A.  Background

11

The Government's case on the merits was comprised of Appellant's confession, testimony from the emergency first responders, the medical examiner, a forensic pediatrician, and several witnesses who described Appellant's inappropriate grief response.

Unsuccessful in its efforts to suppress the confession, the defense proceeded at trial on the theory that Appellant's statement of January 13 was the false product of the agents' efforts to induce Appellant into making a statement. The defense also suggested during its opening statement that the child may have died as a result of a seizure; a possibility the defense maintained could not be eliminated beyond a reasonable doubt by the Government. Finally, the defense attacked the credibility and competence of the Government's medical examiner.

This issue focuses upon the testimony of the Government's forensic pediatrician Dr. Cooper. Dr. Cooper was called by the Government to discuss child abuse in general and in the words of trial counsel, to help the members understand how "parents can kill their children." The defense moved in limine to preclude the witness from offering what it felt was inadmissible profile evidence and evidence of parental behavior that should otherwise be the subject of eyewitness rather than expert witness testimony.

### 1. The Article 39(a) session

At a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), Dr. Cooper presented her qualifications and experience to the military judge.[3]  She then testified about child abuse and maltreatment as it pertained to inflicted injuries on children.  During this session, trial counsel asked Dr. Cooper how one arrives at a diagnosis of fatal child abuse.  The doctor responded in part:

> The most important aspects are the history as given by the family or whoever was in sole custody of the child.  This is just critically important and there is no form of medicine, typically, that proceeds without a history. . . .  And what is really critical in that history is consistency of the history.  If a physically custodial person who presents with a child to an emergency room environment gives a history that, over that night or over the subsequent days to weeks, changes, you have to be very concerned regarding the fact that this may be an inflicted injury.

. . . .

> The second thing we look at is the behavior of the parents or whoever are the custodial people.  The behavior of the person taking care of the child is very telling with respect to whether or not they are exhibiting concern for the well-being of the child. . . . The behavior and demeanor of the parent or the custodial care provider at the time the child presents

---

[3] Dr. Cooper previously served as the assistant chief of pediatric service at Schofield Barracks, the chief of pediatrics at Womack Army Medical Center, Deputy Commander for clinical services, pediatric representative on the Family Advocacy Case Management Team, instructor at the Army Medical Education Department, and member of the Department of Defense Child Fatality Review Committee.  At the time of trial, she was the primary forensic pediatrician for Cumberland County.

> to the hospital is an important fact and one which is to be documented in the medical record.

> Finally, the physical examination, which may reflect exactly what happened at the time when you are in the emergency room environment, but may actually, ultimately, require the evaluation and determination of a medical examiner. In certain types of child maltreatment deaths, the physical examination or the findings on the autopsy may not be one hundred percent clear as to what has happened to the child. This is particularly the case in suffocation or asphyxiation type deaths . . . .

Dr. Cooper went on to explain that this tripartite methodology - history, parental/custodial behavior, and examination - was relied on by "numerous specialists in the field." She then named some of these "specialists," including several forensic pediatricians whom Dr. Cooper described as "well-known" authorities in their field as well as certain law enforcement professionals.

Trial counsel then shifted the focus of Dr. Cooper's testimony to the area of single episodes of child abuse versus multiple episodes. Relying on a work by a Dr. James A. Monteleone entitled Child Maltreatment (2d ed. 1998), which Dr. Cooper considered an authoritative reference, she testified that "[i]n eighty percent of fatal child abuse cases, that fatal event is the first time that that child has ever been abused." Next, relying on a report by the Advisory Board on Child Abuse

and Neglect,[4] Dr. Cooper testified that according to the report "the people most likely to kill children are their biological parents – overwhelmingly so." Citing to professional literature in her field, Dr. Cooper further testified that there are two different categories of predisposing factors to child abuse and neglect - one category pertaining to the child and one pertaining to the adult. Regarding the category relevant to the child, Dr. Cooper stated that "the leading cause of trauma death, now, in the United States, for children under the age of four, is child maltreatment." She then discussed the adult category that included such factors as the presence of substance abuse, the presence of biological parents as opposed to step-parents and babysitters, and whether the child was in a military family setting.

Finally, following Dr. Cooper's testimony pertaining to the methodology that considers history, behavior, and physical examination, trial counsel sought Dr. Cooper's ultimate opinion as to Caitlyn Traum's cause of death. Before doing so, however, trial counsel asked Dr. Cooper what evidence and documents she reviewed in forming her opinion. She stated that she reviewed Caitlyn's medical records, Caitlyn's sister's medical records,

---

[4] The U.S. Advisory Board on Child Abuse and Neglect was established under Pub. L. No. 100-294, section 103, of the Child Abuse Prevention and Treatment Act, amendments of 1988. The report referenced by Dr. Cooper is entitled, A Nation's Shame: Fatal Child Abuse and Neglect in the United States (1995).

and the investigation reports that included Appellant's confession, the emergency medical responses, Family Advocacy records, and the autopsy reports. She then opined, "I feel that her cause of death is homicide or an inflicted fatal child abuse." Dr. Cooper added that she believed the child died as a result of inadequate oxygen consistent with asphyxiation and that Caitlyn "was asphyxiated through a suffocation method." Her reasoning was as follows:

> The reason that I believe that is, first of all, the child died in a manner that cannot be explained by Sudden Infant Death Syndrome or any other obvious medical cause. . . . The second reason that I believe this is the case is because the history given by the custodial person-in this case, her mother-varied from the time she talked to the EMS personnel to the time that she talked to the individuals at the hospital, a very key element.
>
> . . . .
>
>
> . . . She gave a different history as to what had happened to the child. Whenever you see a change in history as to what has happened, that is a very critically important element when you're trying to decide if this is an accidental versus inflicted injury. And then the third reason that I believe this is because this child had trauma to her upper lip. Now, I understand that this patient underwent significant resuscitation efforts, but I have most certainly seen and evaluated suffocation victims-death cases-where children were suffocated to death, who had similar injuries to the inner aspect of their upper lip.

Following the testimony presented at the Article 39(a) session, defense counsel challenged Dr. Cooper's tripartite methodology. The defense focused on Dr. Cooper's use of the

16

victim's history as well as her use of the behavior of the custodial parent. Defense counsel also argued that Dr. Cooper's consideration of Appellant's inconsistent history regarding Caitlyn's condition amounted to an expert's assessment of Appellant's credibility and was therefore impermissible. Finally, the defense asserted that Dr. Cooper's reliance on Appellant's alleged inappropriate grief response was inadmissible character evidence because it portrayed Appellant as a bad parent. While defense counsel suggested that the doctor's opinion was based on only one aspect of Appellant's conduct, her grieving reaction, Dr. Cooper steadfastly insisted that this factor was merely one of a number of factors considered in the "whole assessment when you look at the history, behavior, physical examination and autopsy finding."

After taking Dr. Cooper's testimony at the Article 39(a) session, the military judge heard argument from both sides as to their view of the permissible parameters of Dr. Cooper's testimony before the members. The military judge then ruled that he would allow Dr. Cooper's testimony regarding child abuse in general, her testimony regarding single episode versus multiple episodes of child abuse, her statement that biological parents are the most likely to fatally abuse their children, and the factors relevant to history, behavior, and physical examinations relied upon by experts in diagnosing fatal child

17

abuse. The military judge reasoned that this testimony would be allowed because "it is counterintuitive for a parent to kill their eighteen month old child, based on the facts that have come out so far."

The military judge also ruled that the expert would not be allowed to testify regarding the so-called adult category of predisposing factors of child abuse. The judge prohibited such testimony because he felt it got into profile evidence and ran "awfully close to the types of things that the courts have found to be error." He also ruled that the witness would not be allowed to testify about a typical grieving parent's reaction as contrasted against that of a non-grieving parent. The judge reached this decision because "the [M.R.E.] 403 [prejudice] aspect here outweighs the probative value for the members."

Finally, the judge determined that Dr. Cooper would not be permitted to render her opinion that the cause of death was inflicted fatal child abuse. However, he did rule that the witness could give her opinion that the cause of death was non-accidental asphyxiation. After further discussion, defense counsel indicated that he understood the military judge's ruling, but indicated his objection to the testimony still stood. Thereafter, the military judge concluded the Article 39(a) session.

## 2. Dr. Cooper's testimony before the members

During the trial before the members, trial counsel elicited testimony from Dr. Cooper consistent with the rulings by the military judge. In particular, she testified, "Overwhelmingly, the most likely person to kill a child is going to be his or her own biological parent." Dr. Cooper also testified that "[i]f a child is less than four years of age, the most common cause of trauma death is going to be child maltreatment." The third statement given before the members was, "Eighty percent of children who die, die from a one-time event." After further testimony relevant to various seizure disorders, sudden infant death syndrome, means by which children accidentally suffocate, and other aspects of fatal child abuse, Dr. Cooper concluded her testimony with the following statement: "It is my medical opinion that the cause of death for Caitlyn Traum was asphyxiation of a non-accidental nature." There was no cross-examination from the defense.

B. Discussion

Appellant challenges Dr. Cooper's testimony on two grounds. First, Appellant asserts that three of Dr. Cooper's opinions that were presented to the members constituted profile evidence. In particular, the defense focused on these statements:

"[i]f a child is less than four years of age, the most common cause of trauma death is going to be child maltreatment";

"Eighty percent of children who die, die from a one-time event"; and

"Overwhelmingly, the most likely person to kill a child is going to be his or her own biological parent."

Second, Appellant maintains that the military judge erred in admitting Dr. Cooper's testimony because it was based on Dr. Cooper's review of Appellant's behavior in the emergency room. We review Appellant's arguments in turn to determine whether the military judge abused his discretion in allowing all or part of Dr. Cooper's testimony. See United States v. Houser, 36 M.J. 392, 397 (C.M.A. 1993).

### 1. Profile Evidence

Before expert testimony may be admitted, the following factors must be established by the proponent of such testimony:

> (A) the qualifications of the expert, Mil.R.Evid. 702;[5] (B) the subject matter of the expert testimony, Mil.R.Evid. 702; (C) the basis for the expert testimony, Mil.R.Evid. 703; (D) the legal relevance of the evidence, Mil.R.Evid. 401 and 402; (E) the reliability of the evidence, United States v. Gipson, 24 M.J. 246 (CMA 1987), and Mil.R.Evid. 401; and (F) whether the 'probative value' of the testimony outweighs other considerations, Mil.R.Evid. 403.

---

[5] At trial, the military judge accepted Dr. Cooper as an expert in the field of forensic pediatrics without objection from defense counsel. Thus, Dr. Cooper's qualifications are not in issue on appeal.

Houser, 36 M.J. at 397.

Expert testimony is admissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" M.R.E. 702. "The test is not whether the jury could reach some conclusion in the absence of the expert evidence, but whether the jury is qualified without such testimony 'to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject[.]'" Houser, 36 M.J. at 398.

In contrast, "[g]enerally, use of any characteristic 'profile' as evidence of guilt or innocence in criminal trials is improper." United States v. Banks, 36 M.J. 150, 161 (C.M.A. 1992). See Brunson v. State, 79 S.W.3d 304, 313 (Ark. 2002)(rejecting testimony that the defendant met eight of ten risk factors for batterers likely to kill); Commonwealth v. Day, 569 N.E.2d 397, 400 (Mass. 1991)(child battering profile inadmissible); State v. Clements, 770 P.2d 447, 454 (Kan. 1989)(finding evidence of psychology and treatability of a child sexual offender inadmissible); United States v. Garcia, 25 M.J. 159 (C.M.A. 1987)(summary disposition)(rejecting testimony that appellant's psychological profile was consistent with a person who sexually abused children); United States v. August, 21 M.J. 363 (C.M.A. 1986)(rejecting a profile of the "usual" sexual

child abuser); Sanders v. State, 303 S.E.2d 13 (Ga. 1983)(state

cannot introduce evidence of battering parent syndrome); State

v. Loebach, 310 N.W.2d 58, 64 (Minn. 1981)(evidence placing the

defendant within the profile of a battering parent

inadmissible). Profile evidence is evidence that presents a

"characteristic profile" of an offender, such as a pedophile or

child abuser, and then places the accused's personal

characteristics within that profile as proof of guilt. United

States v. Rynning, 47 M.J. 420, 422 (C.A.A.F. 1998).

The question in this case is whether Dr. Cooper's opinions

constituted impermissible profile evidence or whether they were

admissible opinions of specialized knowledge under M.R.E. 702.[6]

Child abuse is an area where specialized knowledge regarding

pediatric forensics and child abuse may indeed be helpful to

members. Children incur all sorts of injuries as they move

through infancy to the toddler years and beyond. Thus, a panel

might well benefit from an understanding of the methodology

doctors use to determine the cause of an infant's injury. In

the case of fatal child abuse, the value of such specialized

knowledge is equally apparent. Such information helps members

---

[6] Appellant did not raise a challenge under Daubert regarding the reliability of Dr. Cooper's methodology or her conclusion of "non-accidental asphyxiation." See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Therefore, we do not address what impact, if any, a Daubert challenge would have had on the scope and content of Dr. Cooper's testimony.

discern the critical elements of testimony and place that testimony within an analytic framework. This information may also help disabuse members of preconceptions that might cloud their ability to focus on the evidence presented as opposed to preconceptions about the nature of the offense at issue. In light of this predicate, we believe Dr. Cooper's first two statements fall within the rubric of specialized knowledge that is useful to the members in understanding the evidence and determining a fact in question. This testimony was given in the context of her general description of fatal child abuse. Further, these particular statements relate to the characteristics of the child victim in this case rather than Appellant. Comparable evidence has been admitted in cases involving rape trauma syndrome. See United States v. Reynolds, 29 M.J. 105, 111 (C.M.A. 1989). Similarly, evidence of battered child syndrome is often admitted to show that a particular injury "is not accidental or is not consistent with the explanation offered therefore but is instead the result of physical abuse by a person of mature strength." United States v. White, 23 M.J. 84, 87 (C.M.A. 1986).

As we explained in Banks, the ban on profile evidence exists because this process treads too closely to offering character evidence of an accused in order to prove that the accused acted in conformity with that evidence on a certain

occasion and committed the criminal activity in question. This, of course, is prohibited under M.R.E. 404(a)(1). See Banks, 36 M.J. at 161. These two statements by Dr. Cooper do not implicate that concern because they relate to the characteristics of the child victim in this case rather than Appellant.

What we condemned in Banks was the Government's construction of a syllogism "(major premise, minor premise, and conclusion)" used in persuading the members that the appellant was a child abuser. 36 M.J. at 162 n.11. In that case, the Government, through its expert witness, presented the major premise that families with a profile of three particular identified risk factors presented an increased risk of child sexual abuse. The Government then established through further testimony the minor premise that Banks and his family fit this profile. Finally, the prosecution argued for the conclusion that since the minor premise established the major premise, the members could not help but decide that Banks was a child abuser. We discern no such tactic in the record of this case.

Testimony setting up a child battering profile must be distinguished from testimony focusing on the characteristics of a battered child. See Day, 569 N.E.2d at 400. See also Myrna S. Raeder, The Better Way: The Role of Batterers' Profiles and Expert "Social Framework" Background in Cases Implicating

24

Domestic Violence, 68 U. Colo. L. Rev. 147, 160

(1997)(discussing the distinction between battered wife syndrome

and evidence of a batterer profile).  The former is irrelevant

because it is not necessarily true that an accused is a batterer

just because the individual fits a certain profile.  However,

the latter is often helpful in determining a fact in issue.

This is especially true when deciding, as in the instant case,

whether the child died from a seizure as posited by the defense

or whether she was suffocated as alleged by the Government.  We

conclude Dr. Cooper's testimony was the latter.

Dr. Cooper's third statement, "Overwhelmingly, the most

likely person to kill a child is going to be his or her own

biological parent," is more troubling.  Following Dr. Cooper's

testimony and counsel's respective arguments at the Article

39(a) session, the military judge contextually culled out the

testimony he considered profile in nature.  Consequently, the

military judge attempted to limit Dr. Cooper's testimony to

child characteristics of abuse like the history of diagnosing

child abuse, fatal versus nonfatal child abuse, and single

episode versus multiple episodes of abuse.  The judge barred Dr.

Cooper from testifying regarding adult characteristics of child

abusers, like substance abuse, living in a military environment,

and the parent of an unplanned pregnancy.

Nevertheless, Dr. Cooper's statement regarding biological parents clearly reached both the characteristics of the victim as well as the characteristics of the typical offender. It is not enough to say that the Government did not expressly place the accused within the statistic presented, for the accused manifestly fit the statistical pattern presented without the Government connecting the dots. Moreover, while Dr. Cooper's testimony did not come in the form of numeric probability, members might have been left with the impression that if the testimony indicated Appellant's daughter died as a result of child abuse, the probability Appellant committed the offense was "overwhelming," regardless of what specific evidence was presented. In essence, the statement placed a statistical probability on the likelihood that Appellant committed the offense. Thus, we conclude that it was impermissible profile evidence.

However, any error in admitting this statement was harmless. First, the evidence was introduced after Appellant's confession had been admitted and presented to the members. Second, the critical question in this case was whether the victim died by accidental or intentional asphyxiation, not the identity of the perpetrator. Appellant did not contest being alone with the victim at the time of the child's injury.

## 2. Basis for the Expert's Opinion

Appellant also argues that Dr. Cooper should not have been allowed to give her ultimate opinion on the cause of Caitlyn's death because it was not based solely upon medical evidence, but also rested upon her subjective evaluation of Appellant's grieving conduct. In particular, during the Article 39(a) session, Dr. Cooper testified that when forming her opinions she considered the fact that Appellant gave differing accounts regarding Caitlyn's condition to the 911 operator, the paramedics when they arrived at her quarters, and to the hospital personnel when the child arrived at the emergency room.

Dr. Cooper also considered certain statements Appellant allegedly made to witnesses at the hospital as suggestive of an uncharacteristic and inappropriate grief response. For example, Appellant was alleged to have stated to one witness who was trying to console her at the hospital, "I'm just glad I saved the toy receipts." Traum, No. ACM 34225 Slip op. at 2. When this witness commented that the dead child had been a beautiful girl, Appellant stated, "She really was mean. She was mean to her sister and really active." Id. at 3. At root, Appellant argues these remarks were observations lay persons could observe and testify to without medical knowledge. Therefore, Dr. Cooper's testimony was not based on specialized medical

27

knowledge, but ordinary lay observations already offered to the members by non-expert witnesses.

An expert's opinion may be based upon other sources such as "personal knowledge, assumed facts, documents supplied by other experts," or the testimony of witnesses at trial. Houser, 36 M.J. at 399; M.R.E. 703. Dr. Cooper's testimony indicates that her opinions were not based solely on Appellant's grieving reaction, but on a tripartite methodology generally accepted as authoritative in the forensic pediatric field. This methodology focuses on the history of events leading to a child's condition, the behavior of the custodial caretaker, and the physical examination reports including those from the autopsy. Further, the record supports a conclusion that this methodology is relied on by experts in the field of forensic pediatrics. M.R.E. 703 allows experts to rest their opinions on precisely this basis. Therefore, it is clear Dr. Cooper's testimony was rooted in more than lay observations regarding Appellant's conduct. Moreover, it was the eyewitnesses and not Dr. Cooper who testified to the members about Appellant's reactions in the emergency room.

### 3. Probative Value

However relevant and reliable an expert's testimony might be, such evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members[.]" M.R.E.

28

403. The record indicates that the military judge was acutely aware of the dangers of profile evidence. It is worth noting the military judge's comment at the time he made his ruling with regard to admission of Dr. Cooper's testimony. The judge clearly considered the expert's testimony balanced against "the facts that have come out so far." When Dr. Cooper testified during the trial, the members had already received Appellant's confession, the testimony of the medical examiner, and the testimony of various witnesses concerning statements Appellant made indicating either a lack of grief or at best, an inappropriate grief response. Further, the military judge culled out what he thought was impermissible profiling of Appellant and allowed opinions that were based on the professional literature of the field of expertise and on a methodology accepted by experts in that field. Finally, it is clear the military judge understood the constraint of M.R.E. 403 when he was determining what would or would not be allowed. Based on this record, we cannot say the military judge abused his discretion in weighing the probative value of the expert testimony against any prejudicial effect it might have presented.

III

Life Without Possibility of Parole

Finally, Appellant takes issue with the advice given to the convening authority by the staff judge advocate. The advice given stated that the "maximum imposable sentence for the offense of [premeditated murder] of which SrA Traum was convicted is life imprisonment, without eligibility for parole." SJAR, para. 6 (emphasis added). Article 56a, UCMJ, 10 U.S.C. § 856a (2000), was enacted on November 18, 1997. Appellant was sentenced on September 17, 1999. In light of our recent decision in United States v. Ronghi, 60 M.J. 83 (C.A.A.F. 2004), life without eligibility for parole was an authorized punishment at the time of Appellant's trial.

Decision

The military judge did not abuse his discretion in admitting the expert testimony or Appellant's confession, nor, was there error in the post-trial processing of Appellant's case. The decision of the United States Air Force Court of Criminal Appeals is affirmed.

30

United States v. Traum, No. 02-0885/AF

GIERKE, Judge, with whom EFFRON, Judge, joins (concurring in part and in the result):

I agree with the majority on all issues except I(A), concerning the necessity to provide rights warnings before a law enforcement agent may ask a suspect to take a polygraph examination.

Regardless of whether, as a general matter, such a request is reasonably likely to elicit an incriminating response, in this case it did not do so. Rather, all of Appellant's incriminating statements were made only after Special Agent Kraus had informed Appellant of her rights pursuant to Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831 (2000), Miranda v. Arizona, 384 U.S. 436 (1966), and United States v. Tempia, 16 C.M.A. 629, 37 C.M.R. 249 (1967), and after Appellant waived those rights.

Voluntariness is the touchstone for determining a subsequent statement's admissibility even where the suspect has let the cat out of the bag in a previous unwarned but voluntary statement. See United States v. Lichtenhan, 40 M.J. 466 (C.M.A. 1994). In this case, Appellant made no incriminating statements before Special Agent Kraus gave her a complete rights warning and obtained a waiver of those rights. Because Special Agent Engelman's request resulted in no taint, it did not affect the Appellant's admissions to Special Agent Kraus. There is,

therefore, no need to resolve issue I(A).  I reserve judgment on

that legal issue.

ERDMANN, J. (concurring in part and in the result):

I agree with the majority on all issues other than the nature of the three statements made by Dr. Cooper. In the context of this case, these statements are improper profiling evidence in that they characterized Senior Airman Traum as a person who would both abuse and kill her natural child.

I recognize the distinction made by the majority between testimony relating to the characteristics of a child victim and the characteristics of an accused. However, testimony that in isolation would not constitute "profiling" evidence may well become "profiling" when heard in the context of a particular case. This is such a case.

Before the members, Dr. Cooper first stated that "eighty percent of children who die, die from a one[-]time event." Because there was no evidence of prior abuse and unrefuted evidence that Traum had been alone with her baby prior to the death, this statement had the effect of rendering it 80% likely that Traum was the cause of the "one[-]time event" that resulted in her baby's death.

Dr. Cooper's next statement was that "[i]f a child is less than four years of age, the most common cause of trauma death is going to be child maltreatment." The prosecution had already established that the baby was under

1

four, showed evidence of physical trauma and was alone with Traum during the time any trauma could have been inflicted. In conjunction with the earlier evidence, this statement identified the death as resulting from trauma and identified Traum as the only person who could have inflicted the trauma. These two conclusions were virtually inseparable and the second is clearly beyond the realm of permissible expert testimony.

As noted by the majority, Dr. Cooper's final statement is certainly the most troublesome: "Overwhelmingly, the most likely person to kill a child is going to be his or her own biological parent." Contextualized, Dr. Cooper's statement meant that Traum, as the biological parent, was overwhelmingly the most likely person to have killed her child. An expert may not testify that the accused committed the crime being tried, and Dr. Cooper should not have been permitted to do through presentation of "information or data" that which she could not have done through direct testimony. See United States v. Diaz, 59 M.J. 79, 92 (C.A.A.F. 2003)(noting "fundamental rule of law that experts may not testify as to guilt or innocence").

In United States v. Banks, 36 M.J. 150, 161 (C.M.A. 1992), this Court condemned "use of any characteristic 'profile' as evidence of guilt or innocence in criminal

2

trials." We defined the nature of such improper profile evidence to go beyond character evidence per se:

> Inadmissible profile evidence does not merely address a profile where the factors relate only to a "character trait" of the accused. The factors in the profile may be <u>any information or data</u> so as to place appellant in an alleged "group" of persons who have committed offenses in the past.

Id. at 163. While all three of Dr. Cooper's statements constitute "profiling" evidence, taken together they certainly could cause the members to classify Traum as a child abuser and killer. Consistent with our holding in <u>Banks</u>, these statements carry the danger of prejudice "greatly" outweighing any probative value the information may have. <u>Id.</u> at 161. Evidence such as this turns the trial of criminal charges away from one of facts to "a litmus-paper test for conformity with any set of characteristics, factors, or circumstances." <u>Id.</u>

Finally, in this case the military judge admitted the three statements because it was "counterintuitive" that a parent would be involved in the death of his or her child. This ruling reveals that the military judge admitted the evidence not to show that the child's death was a crime, but to show specifically that the parent was the perpetrator. The very purpose for which the statements

3

were admitted was to identify Traum as one of a very limited group who would kill her child based on probabilities and inferences rather than upon the facts of the case.

Nevertheless, for the same reasons that the majority found the error with respect to the admission of Dr. Cooper's third statement to be harmless, I find that the error relating to the admission of all three statements to be harmless. Therefore, I join in affirming the decision of the court below.