*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
GASTON, STEWART, and HOUTZ
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Wendell E. MELLETTE, Jr.**
Electrician's Mate (Nuclear) First Class (E-6), U.S. Navy
*Appellant*

**No. 201900305**

Decided: 14 May 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Warren A. Record

Sentence adjudged 16 August 2019 by a general court-martial convened at Naval Air Station Jacksonville, Florida, consisting of officer and enlisted members. Sentence in the Entry of Judgment: confinement for five years and a dishonorable discharge.

For Appellant:
*Lieutenant Gregory R. Hargis, JAGC, USN*
*Lieutenant Michael W. Wester, JAGC, USN*

For Appellee:
*Lieutenant Commander Jeffrey S. Marden, JAGC, USN*
*Major Kerry E. Friedewald, USMC*

Senior Judge GASTON delivered the opinion of the Court, in which Judges STEWART and HOUTZ joined.

_____

**PUBLISHED OPINION OF THE COURT**

_____

GASTON, Senior Judge:

Appellant was convicted, contrary to his plea, of sexual abuse of a child in violation of Article 120b, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 920b (2012), for committing sexual contact upon his 15-year-old sister-in-law.

He asserts six assignments of error [AOEs], which we renumber as follows: (1) the military judge abused his discretion by denying a Defense motion for in camera review and production of the victim's mental health diagnoses, treatment, and prescribed medications; (2) the military judge abused his discretion by allowing the Government to admit expert testimony that Appellant fit the profile of a perpetrator who grooms children for sex; (3) the evidence is legally and factually insufficient to support his conviction; (4) the military judge committed plain error by allowing the victim to recommend a specific sentence in her unsworn victim impact statement; (5) the record of trial is incomplete because the military judge failed to attach four enclosures of a Defense motion;[1] and (6) the findings and sentence should be set aside under the cumulative error doctrine.

We find merit in Appellant's first, second, and fourth AOEs, order some of the language stricken from the specification, affirm the finding as to the remaining language, and reassess the sentence.

## I. BACKGROUND

In August 2013, Stacy,[2] the 15-year-old sister of Appellant's then-wife, Ms. Mitchell, underwent a week of inpatient mental health treatment for ongoing depression and anxiety, which had resulted in her cutting herself. Upon discharge, she was prescribed Prozac, continued receiving professional

---

[1] As we have granted the Government's motion to attach the missing enclosures to the record, we find this AOE to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

counseling for about a year, and remained on Prozac and other medications, the side effects of which included causing her nightmares.

A couple of months after Stacy's discharge from the mental health facility, Appellant started taking on a more big-brotherly role toward her, having one-on-one conversations with her, and taking her on rides in his truck to get ice cream or run errands. During these rides Appellant began placing his hand on Stacy's thigh and her upper back between her shoulders, and on one occasion slid his hand down and undid her bra through her shirt. On an occasion in the home where they both lived with Ms. Mitchell and Stacy's parents, he asked Stacy to walk over to look at something on his computer or phone and then touched her back, thigh, and buttocks.

When Appellant deployed on his submarine from February to April 2014, Stacy sent him provocative emails telling him things like "when you were touching me, I wanted more"[3] and asking him what he would think if she told him she wanted "to f[***]" him.[4] Stacy's emails were intercepted by the submarine's email monitoring system, and Appellant was confronted about them by his chain of command. Appellant explained that the emails were from his wife's little sister, that she was infatuated with him, and that the comments related to him innocently placing his hand on her shoulder. His command had him email Stacy instructing her to stop emailing him, and he also sent an email to Ms. Mitchell informing her about the situation.

Nevertheless, Appellant told a friend and colleague aboard the submarine that he was contemplating doing what Stacy's email suggested—i.e., having sex with her—and at some point after he returned from deployment, he resumed his one-on-one interactions with Stacy, which became more overtly sexual. He kissed her; touched her thighs, buttocks, and vaginal area; commented on her buttocks and the size of her breasts; and asked, coarsely, whether she was aroused. Eventually, he began having vaginal intercourse with her, and did so on a number of occasions.

In mid-February 2015, Ms. Mitchell caught Appellant kissing Stacy. When confronted, Appellant denied they were having sex. Around this time, the local Department of Children and Family Services [DCF] sent someone to Stacy's house to investigate a report of an inappropriate relationship made by Stacy's boyfriend, whom Stacy had told, along with her two closest female

---

[3] Pros. Ex. 9.

[4] Pros. Ex. 6.

friends, about her relationship with Appellant. When questioned by DCF, Stacy denied anything had happened between her and Appellant.

Appellant and Ms. Mitchell separated soon after his relationship with Stacy came to light, and they divorced in 2016. Custody of their daughter, Christine, was awarded to Ms. Mitchell with visitation rights to Appellant. In 2018, Appellant successfully petitioned for a modification of the custody arrangement to enable Christine to visit him in Guam, where he was then stationed. When Ms. Mitchell subsequently refused to allow Christine to be picked up for a scheduled visitation per the custody arrangement, Appellant filed for Ms. Mitchell to be held in contempt of court.

In response, Ms. Mitchell went with her (and Stacy's) mother to Appellant's commanding officer and reported Appellant's inappropriate relationship with Stacy from several years before. Stacy's mother spoke to Stacy about what had happened between her and Appellant and helped Stacy reconstruct the timeline of events. At her mother's urging, Stacy agreed to be interviewed by the Naval Criminal Investigative Service [NCIS] in June 2018. During the interview, Stacy told NCIS that Appellant had committed the sexual conduct with her when she was still 15 years old, but admitted she had "always been horrible with remembering times and dates."[5] She said she did not report what happened sooner because Appellant had told her not to and she was scared of him. Stacy later gave a civil deposition in April 2019 in connection with Appellant and Ms. Mitchell's custody dispute over Christine. When asked during the deposition about her sexual interactions with Appellant, Stacy stated that she was not sure of the dates or specific timeframes, but that the touching occurred prior to the sexual intercourse.

The timing of the sexual conduct in relation to Stacy's 16th birthday in mid-July 2014 was a central issue at Appellant's court-martial, as both the offenses charged against him—sexual abuse of a child and sexual assault of a child—required the Government to prove beyond a reasonable doubt that Stacy was under the age of 16 years at the time of the offense. Appellant's friend from the submarine testified that Appellant admitted having sexual intercourse with Stacy, but believed this disclosure did not occur until late-July or August 2014. Appellant admitted during a recorded telephone conversation with Stacy's father that he had sex with Stacy multiple times, but maintained it did not happen until after her 16th birthday. Stacy testified she had trouble remembering dates and times, and could "remember things from a couple of weeks ago but not a couple of years ago," but she was "very

---

[5] App. Ex. XXXII at 29.

sure" or "100 percent sure" that Appellant touched her in a sexual way and started having sexual intercourse with her when she was 15 years old.[6] She testified she was sure of this because the first time Appellant had sexual intercourse with her was when Ms. Mitchell was still pregnant with Christine, who was born in June 2014, a month prior to Stacy's 16th birthday.

The members convicted Appellant of sexual abuse of a child by touching Stacy on "divers," or multiple, occasions with an intent to gratify his sexual desire, but acquitted him of sexual assault of a child by having vaginal sex with her.

## II. DISCUSSION

### A. In Camera Review and Production of Mental Health Records

Appellant asserts the military judge erred in denying his pretrial motion for in camera review and production of Stacy's mental health diagnoses, treatment, and prescribed medications. We review the denial of such a motion for an abuse of discretion. *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018). A military judge abuses his discretion when he (1) predicates his ruling on findings of fact that are not supported by the evidence of record; (2) uses incorrect legal principles; (3) applies correct legal principles to the facts in a way that is clearly unreasonable, or (4) fails to consider important facts. *United States v. Commisso*, 76 M.F. 315, 321 (C.A.A.F. 2017) (citations omitted). We review a military judge's conclusions of law de novo. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004).

Generally, the parties to a court-martial "shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." UCMJ art. 46(a). The rules prescribed by the President provide that "[e]ach party is entitled to the production of evidence which is relevant and necessary." Rule for Courts-Martial [RCM] 703(f)(1). Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence. Military Rule of Evidence [MRE] 401. "Relevant evidence is necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue." RCM 703(f), Discussion.

---

[6] R. at 460, 481.

Relevant and necessary evidence can be excepted from production or disclosure by a proper claim of privilege. MRE 501. The privilege at issue here—the psychotherapist-patient privilege—provides:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist or an assistant to the psychotherapist, in a case arising under the [UCMJ], if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.

MRE 513(a). The rule provides that communications are confidential if "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional services to the patient or those reasonably necessary for such transmission of the communication." MRE 513(b)(4).

Before ordering such privileged material produced even for in camera review, the military judge must find the moving party has demonstrated four things by a preponderance of the evidence:

> (A) a specific, credible factual basis demonstrating a reasonable likelihood that the records or communications would contain or lead to the discovery of evidence admissible under an exception to the privilege;

> (B) that the requested information meets one of the enumerated exceptions under subsection (d) of [MRE 513];

> (C) that the information sought is not merely cumulative of other information available; and

> (D) that the party made reasonable efforts to obtain the same or substantially similar information through non-privileged sources.

MRE 513(e)(3). If the military judge determines each of the above factors is met except for one of the rule's enumerated exceptions, the military judge must then determine whether in camera review is constitutionally required, and if so, take further action as necessary. *J.M. v. Payton-O'Brien*, 76 M.J. 782, 789-90 (N-M. Ct. Crim. App. 2017).

Here, after openly discussing with family members and NCIS and during her civil deposition her mental health diagnoses and treatment, including her recollection of her prescribed medications, Stacy asserted her psychotherapist-patient privilege to prevent Appellant's trial defense counsel from accessing this information in her mental health records. The Defense then moved

for in camera review and production of the information, arguing that (1) the requested information was not privileged because the confidential communication that the psychotherapist-patient privilege protects does not include diagnosis and treatment information; [7] (2) Stacy waived any privilege by repeatedly discussing her mental health issues with various third parties; and (3) even if not waived, the privilege should yield to in camera review and production of the requested information as constitutionally required. A Defense expert opined that based on the information and symptoms Stacy had already revealed, Stacy could have Borderline Personality Disorder, which could further manifest in attention-seeking and manipulative behaviors, particularly when associated with fear of abandonment. The Defense argued that information about Stacy's diagnoses and treatment was relevant to the issues of suggestion, memory, and truthfulness, which all impacted her credibility as the only Government eyewitness to the charged offenses. It argued her medication list was important to assessing any additional side effects or adverse interactions among her medications, as it related to memory issues associated with Stacy's allegations of misconduct several years before.

The military judge denied the Defense motion. He concluded that the records containing the information were privileged, that the Defense had not shown the requested information was "reasonably segregable [sic]"[8] from the privileged communications, and that waiver applied only to the information Stacy had already disclosed. He concluded that the Defense had failed to meet its burden of demonstrating that in camera review or production of the requested information was required. He found that by her own admission Stacy had been diagnosed with depression, anxiety, and self-harm, and that the Defense offered only mere speculation of other diagnoses. He found that the information sought was cumulative because Appellant already knew of Stacy's diagnoses and treatment from her previous disclosures. Finally, he concluded the Defense had failed to show why the requested information was relevant and necessary under RCM 703, as opposed to a mere "fishing expedition."[9]

---

[7] The Defense clarified it was seeking the diagnosis and treatment plan, "not . . . specific notes from any counseling session." R. at 53.

[8] R. at 70.

[9] App. Ex. V at 7.

*1. What information is covered by the psychotherapist-patient privilege*

As an initial matter, we must determine whether the mental health information requested by the Defense—i.e., diagnoses and treatment, including prescribed medications—is protected from disclosure by the psychotherapist-patient privilege. Both parties argue the military judge erred in concluding such information was privileged. We disagree.

"[C]onstruction of a statute is a question of law we review de novo." *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018) (citation omitted). Where a privilege is codified in the evidentiary rules, ordinary principles of statutory construction control, with the caveat that "privileges should be construed narrowly, as they run contrary to a court's truth-seeking function." *United States v. Custis*, 65 M.J. 366, 369 (C.A.A.F. 2007) (quoting *Trammel v. United States*, 445 U.S. 40, 50-51 (1980)). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Custis*, 65 M.J. at 370 (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000)).

The psychotherapist-patient privilege protects against the disclosure of "confidential communication made *between the patient and a psychotherapist* or an assistant to the psychotherapist . . . if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition." MRE 513(a) (emphasis added). Under a plain reading of this language, the privilege protects communications "between" the patient and the psychotherapist—meaning communication from the patient to the psychotherapist and communication from the psychotherapist to the patient—that are made for the purpose of facilitating diagnosis and treatment of the patient's condition. In other words, the protection covers not only the patient's description of her symptoms, but also the psychotherapist's rendering of a diagnosis and treatment plan, based on those symptoms, back to the patient.

This language is very similar to the language used in the attorney-client privilege, which protects confidential communications "between" the client and the lawyer that are "made for the purpose of facilitating the rendition of professional legal services to the client." MRE 502.[10] "Professional legal

---

[10] By contrast, the language in the privilege covering communications to clergy protects only "confidential communication by the person *to* a clergyman." MRE 503 (emphasis added).

services" include, at a minimum, providing legal advice. It is beyond cavil that the attorney-client privilege covers not only the description of the issue from the client to the attorney, but also the diagnosis—i.e., the legal advice—from the attorney to the client. For this reason, we disagree with our sister court's view that the psychotherapist-patient privilege "extends to statements and records that reveal the substance of conversations that may have been for the 'purpose of facilitating diagnosis or treatment,' but not to the diagnosis or treatment itself." *United States v. Rodriguez*, No. 20180138, 2019 CCA LEXIS 387, at \*8 (A. Ct. Crim. App. Oct. 1, 2019) (unpublished), *pet. for rev. denied*, 79 M.J. 430 (C.A.A.F. 2020) (citing *H.V. v. Kitchen*, 75 M.J. 717, 721 (C. G. Ct. Crim. App. 2016) (Bruce, J., dissenting)). Interpreting the psychotherapist-patient privilege in this manner not only ignores its use of the word "between" as a protection for two-way communications, but would be akin to finding the attorney-client privilege protects the client's statements made for the purpose of facilitating the provision of legal advice, but not the legal advice itself. Thus, we reject this interpretation because it both ignores the plain language of the rule and leads to absurd results.

Although we should construe privileges narrowly, such an overly narrow interpretation of what the psychotherapist-patient privilege covers would also undermine the purpose of the privilege. The psychotherapist-patient privilege came into existence as a result of the Supreme Court's decision in *Jaffee v. Redmond*, which recognized the societal interest in a mentally healthy populace and found that "confidentiality is a *sine qua non* for successful psychiatric treatment." 518 U.S. 1, 10 (1996). The Court further recognized that the patient's expectation in this regard is vitally important, since the "promise of confidentiality would have little value if the patient were aware that the privilege would not be honored in a federal court." *Id.* at 13. Consequently, we have previously found that in codifying the privilege in MRE 513 in the wake of *Jaffee*, "[t]he policy decision of Congress and the President is clear: the psychotherapist-patient privilege should be protected to the greatest extent possible." *Payton-O'Brien*, 76 M.J. at 787.[11] To inter-

---

[11] *See also* Dep't of Def. Instr. 6490.08, *Command Notification Requirements to Dispel Stigma in Providing Mental Health Care to [Servicemembers]*, para. 3 (Aug. 17, 2011) (requiring that, "to dispel the stigma of seeking mental health care," Department of Defense healthcare providers "shall follow a presumption that they are not to notify a [servicemember's] commander when the [servicemember] obtains mental health care," and where notification is required, "shall provide the minimum amount of information to the commander concerned as required to satisfy the purposes of the disclosure").

pret the privilege as covering only the patient's description of her symptoms, but not the psychotherapist's diagnosis and treatment of her condition, would deter patients from seeking mental health treatment in precisely the way *Jaffee* sought to avoid.

For the same reason we hold that, insofar as it pertains to mental health treatment, the prescription of medication is also covered by the privilege. The Coast Guard Court of Criminal Appeals held as much in *H.V. v. Kitchen*, pointing out that "diagnoses and the nature of treatment necessarily reflect, in part, the patient's confidential communications to the psychotherapist . . . ." 75 M.J. at 719. We agree. Revealing what psychiatric medication a patient has been prescribed to treat a diagnosed condition would in many circumstances suggest, if not reveal, the diagnosis itself.[12] Thus, we find that as a form of mental health treatment, the prescription of medication falls within the same concern, noted in *Kitchen*, that "[t]he privilege would essentially be gutted if a psychotherapist could be ordered to testify about a person's diagnosis or treatment, over the person's objection, so long as the psychotherapist refrained from expressly describing or referring to the content of any confidential communications." *Kitchen,* 75 M.J. at 719 (quoting *Stark v. Hartt Transportation Systems, Inc.*, 937 F. Supp. 2d 88, 91-92 (D. Me. 2013)).

*2. Waiver of the privilege*

While we find the military judge correctly construed what information is covered by the psychotherapist-patient privilege, we hold that he erred in summarily rejecting the Defense argument that Stacy waived the privilege by discussing her mental health diagnoses and treatment, including her prescribed medications, with her family, with NCIS, and during her civil deposition.

A privilege is waived where the holder of the privilege "voluntarily discloses or consents to disclosure of *any significant part* of the matter or communication *under such circumstances that it would be inappropriate to allow the claim of privilege*." MRE 510(a) (emphasis added). This language is

---

[12] We also find unpersuasive the *Rodriguez* court's position that mental health prescriptions cannot involve "confidential communications" because they are "intended to be disclosed to a non-psychotherapist third party—the pharmacist who fills it." *Rodriguez*, 2019 CCA LEXIS 387, at *9. Drawing from the language of the rule, we find that communications from the psychotherapist to a pharmacist to fill prescriptions are "in furtherance of the rendition of professional services to the patient," and are therefore protected from further disclosure. MRE 513(b)(4).

plainly broader than the military judge's interpretation that "even if the privilege were waived, it would be only as to those matters already disclosed."[13] We also note that "whether a waiver is valid turns on whether the disclosure was voluntary," not whether the privilege holder knew the information disclosed was privileged or intended to waive the privilege by disclosing it. *United States v. Jasper*, 72 M.J. 276, 280-81 (C.A.A.F. 2013) (citations omitted).

Here, Stacy openly discussed her mental health matters with multiple people on multiple occasions. The inpatient and follow-up treatment she received occurred immediately prior to and during the timeframe of the charged offenses, the reporting of which was delayed for a number of years and eventually occurred in response to a child-custody dispute over Stacy's niece. Irrespective of whether Stacy knew the information was privileged or intended to waive the privilege by discussing it, we find based on the record before us that her disclosures were voluntary, involved a significant part of the matters at issue, and occurred under such circumstances that it would be inappropriate to allow the claim of privilege.[14] Hence, in this regard, we concur with the parties in concluding the military judge erred in finding the information requested by the Defense was privileged.

We further find error in the military judge's conclusion that the requested information was not subject to production under RCM 703(f). Here, the Defense sought to confirm Stacy's stated diagnoses and ascertain whether there were any other related diagnoses that could impact her credibility. The Defense also sought to review the list of Stacy's prescribed medications, not all of which she could remember the names of, to assess their interactive side effects and potential for adverse effect on memory in a case involving a delay in reporting for several years, allegations that Stacy had previously denied, and a report made under circumstances—revolving around the custody battle over Christine—giving rise to a strong motive to fabricate at least their timeframe, if not their substance. Under these circumstances we find clearly unreasonable the military judge's conclusion that the requested information was not relevant and necessary.

---

[13] App. Ex. V at 7.

[14] To conclude otherwise would allow a privilege holder to delimit discoverable evidence to establish advantageous facts and then invoke the privilege to deny the evaluation of their context, relevance, or truth—thus turning the privilege from a shield into a sword—a circumstance the waiver rule's broader language seeks to avoid.

The military judge expressed concern that the requested information—diagnoses and treatment, including prescribed medications—was not reasonably separable from other information subject to privilege. But this situation is contemplated by the rule, which not only authorizes the military judge to conduct an in camera review of the records in which information subject to production is contained, but also specifically requires that

> [a]ny production or disclosure permitted by the military judge must be narrowly tailored to only the specific records or communications, *or portions of such records or communications*, that meet the requirements for one of the enumerated exceptions to the privilege . . . and are included in the stated purpose for which the records or communications are sought . . . .

MRE 513(e)(4) (emphasis added). The purpose of in camera review is to allow the trial judge to review the records and separate out the information that should be produced or disclosed from the information that should remain protected. Accordingly, we hold the military judge erred in not following the procedures we have previously outlined either to conduct the in camera review or to take further action as necessary. *See Payton-O'Brien*, 76 M.J. at 789-90.

### 3. In camera review and production under MRE 513(e)(3)

Even assuming *arguendo* that Stacy's discussions of her mental health matters did not waive her privilege, we find the military judge abused his discretion in concluding the Defense had not shown, at the very least, that an in camera review of the pertinent mental health records was constitutionally required. We have previously identified several key areas where courts have overridden privileges in order to protect against the infringement of an accused's weighty interests of due process and confrontation: "(1) recantation or other contradictory conduct by the alleged victim; (2) evidence of behavioral, mental, or emotional difficulties of the alleged victim; and (3) the alleged victim's inability to accurately perceive, remember, and relate events." *Payton-O'Brien*, 76 M.J. at 789. As we explained, "[t]he second and third areas, in particular, . . . go to the very essence of witness credibility and reliability—potential defects in capacity to understand, interpret, and relate events. Additionally, these areas intersect with the medical community's ability to interpret that credibility." *Id.* at 789 n.28.[15]

---

[15] *See also United States v. Reese*, 25 M.J. 93, 95 (C.M.A. 1987) (stating that "[s]ome forms of emotional or mental defects have been held to 'have high probative

This case involves all of these key areas of concern. After telling friends about her sexual relationship with Appellant, Stacy denied to local DCF authorities that anything inappropriate had happened between them. There is substantial evidence of Stacy's behavioral, mental, and emotional difficulties, which necessitated not only inpatient treatment but continued follow-on care, the timing of which was pertinent to both the timeframe and the substance of the charged offenses. And Stacy repeatedly stated in both formal and informal settings that she was unable to remember the precise timeframe of the events in question, which was the crucial issue in the trial.

The information requested by the Defense not only bore on these issues, but under the circumstances of this case was (1) reasonably likely to yield admissible information, (2) was not cumulative, and (3) was not available through other non-privileged sources. The military judge found these latter three requirements were not satisfied based largely on the view that Appellant already knew of Stacy's diagnoses and treatment from her own disclosures. However, Stacy admitted she was unable to recall all of her medications, and as the military judge recognized with respect to the information she did disclose, "she might have told the truth and she might not have told the truth."[16] Given the centrality of Stacy's testimony to the substantially delayed allegations, the circumstances under which they were reported, and the plethora of issues posed by her mental health diagnoses and treatment, we conclude the military judge's application of the factors under MRE 513(e) to the facts of this case constituted an abuse of discretion.

### 4. Prejudice

Having found error in the denial of the Defense motion, we must determine whether the error materially prejudiced Appellant's substantial rights. *Chisum*, 77 M.J. at 179. Where an error includes a "constitutionally improper denial of a defendant's opportunity to impeach a witness for bias," we must find the error harmless beyond a reasonable doubt. *Id.* For such a review, we weigh factors including:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or

---

value on the issue of credibility . . . a conservative list of [which] would have to include . . . most or all of the neuroses, . . . alcoholism, drug addiction, and psychopathic personality.'") (quoting *United States v. Lindstrom,* 698 F.2d 1154, 1160 (11th Cir.1983)).

[16] R. at 70.

absence of evidence corroborating or contradicting the testimo-
ny of the witness on material points, the extent of cross-
examination otherwise permitted, and, of course, the overall
strength of the prosecution's case.

*Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). "A constitu-
tional error is harmless when it appears beyond a reasonable doubt that the
error complained of did not contribute to the verdict obtained." *Id.* at 179
(quoting *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003)). "To say that an error
did not 'contribute' to the ensuing verdict" means "to find that error unim-
portant in relation to everything else the jury considered on the issue in
question, as revealed in the record." *Id.* at 179 (quoting *Yates v. Evatt,* 500
U.S. 391, 403 (1991)).

As we noted in *Payton-O'Brien*, "[i]n these scenarios, serious concerns
may be raised regarding witness credibility—which is of paramount im-
portance—and may very well be case dispositive." *Payton-O'Brien*, 76 M.J. at
789. Moreover, "[w]e cannot discount the possibility that the information
contained in [Stacy's records] may have had an impact on the [D]efense's trial
strategy." *United States v. Reece*, 25 M.J. 93, 95 (C.M.A. 1987).

In this case, there was little dispute that a sexual relationship occurred
between Appellant and his teenage sister-in-law, as Appellant admitted
having vaginal intercourse with her on multiple occasions. The principal
issue at trial was whether the charged acts occurred before or after Stacy's
16th birthday in mid-July 2014. Stacy testified that the touching offenses
happened on multiple occasions and preceded the vaginal intercourse. Her
testimony on the timing of the conduct was subject to vigorous cross-
examination, which thoroughly revealed the inconsistency of her prior denials
and other statements, the years-long delay of her report, her faulty memory
and the contaminating influence on it by other family members, and a strong
ulterior motive to slant her testimony in favor of aiding her sister's ongoing
child-custody dispute against Appellant. While the members acquitted
Appellant of sexual assault of a child, they convicted him of sexual abuse of a
child "on divers occasions," which indicates they found multiple instances of
sexual contact were proven beyond a reasonable doubt.

We find strong corroboration for Stacy's testimony that the sexual contact
began prior to Appellant's submarine deployment from February to April
2014—namely, the provocative emails she sent to Appellant, telling him
things like "when you were touching me, I wanted more."[17] That sexual

---

[17] Pros. Ex. 9.

contact occurred prior to Appellant's deployment was also corroborated by the family's awareness of Appellant's one-on-one interactions with Stacy and, at least to some extent, by Appellant's admissions to third parties.[18] Thus, the evidence before the members that sexual contact occurred on at least one occasion before Stacy's 16th birthday was both corroborated and strong. With respect to this pre-deployment sexual contact, after weighing all of the factors, we conclude that the error is "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record," and find it harmless beyond a reasonable doubt. *Chisum*, 77 M.J. at 179.

By contrast, for the alleged sexual contact after Appellant's deployment, there was little corroboration for Stacy's testimony that it occurred prior to her 16th birthday. As the proof for this contact rested exclusively on Stacy's testimony, we find the error may have contributed to the finding in this regard. Consequently, we find that the words, "on divers occasions," must be stricken from the specification of which Appellant was convicted, which we accomplish in our decretal paragraph below.

## B. Admission of Profile Testimony Regarding "Grooming"

Appellant asserts the military judge erred in admitting testimony from the Government's forensic psychologist that Appellant fit the profile of a perpetrator who grooms children for sex. We review a trial court's decision to admit expert testimony for abuse of discretion. *United States v. Hays*, 62 M.J. 158, 165 (C.A.A.F. 2005). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citation and internal quotation marks omitted).

### 1. The limits of opinion testimony

A witness qualified as an expert may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[18] In addition to admitting his sexual desire for Stacy to a friend aboard the submarine, Appellant emailed Ms. Mitchell that the statement Stacy emailed him, "'when you were touching me, I wanted more,' could have been simply put as 'I liked the back message [sic].'" Pros. Ex. 9.

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

MRE 702. Under this rule expert testimony about certain aspects of victim behavior is generally admissible. Experts may, for example, testify "as to what symptoms are found among children who have suffered sexual abuse and whether the child-witness has exhibited these symptoms," or discuss "various patterns of consistency in the stories of child abuse victims and compar[e] those patterns with patterns in . . . [the victim's] story," so long as they do not opine as to whether the witness is telling the truth about an allegation. *United States v. Harrison*, 31 M.J. 330, 332 (C.M.A. 1990) (citations and internal quotation marks omitted).

By contrast, "[g]enerally, use of any characteristic 'profile' as evidence of guilt or innocence in criminal trials is improper." *United States v. Banks*, 36 M.J. 150, 161 (C.M.A. 1992). "Profile evidence is evidence that presents a 'characteristic profile' of an offender, such as a pedophile or child abuser, and then places the accused's personal characteristics within that profile as proof of guilt." *United States v. Traum*, 60 M.J. 226, 234 (C.A.A.F. 2004) (citations omitted). Thus, "the focus is upon using a profile as evidence of the *accused's* guilt or innocence, and not upon using a characteristic profile to support or attack a witness's or victim's credibility or truthfulness." *United States v. Brooks*, 64 M.J. 325, 329 (C.A.A.F. 2007) (emphasis in original).

"[T]he ban on profile evidence exists because this process treads too closely to offering character evidence of an accused in order to prove that the accused acted in conformity with that evidence on a certain occasion and committed the criminal activity in question." *Traum*, 60 M.J. at 235. The prohibition thus "is rooted in MRE 404(a)(1) that precludes the prosecution from introducing character evidence of an accused who has not put his character at issue." *Banks*, 36 M.J. at 161. As "[o]ur system of justice is a trial on the facts, not a litmus paper test for conformity with any set of characteristics, factors, or circumstances," profile evidence can be admitted "only in narrow and limited circumstances," to include "as purely background material to explain sanity issues[,] . . . as an investigative tool to establish reasonable suspicion[,] . . . [or] in rebuttal when a party 'opens the door' by introducing potentially misleading testimony." *Id.* (citations omitted).

Here, the Defense objected to the Government's intent to elicit testimony from its expert about "grooming behavior," which the expert defined as the "behaviors of a perpetrator of child sexual abuse to solicit the access to and

compliance of the targeted victim, as well as the manipulation in favor with the gatekeepers to that child."[19] The expert opined that Appellant's one-on-one interactions with Stacy—spending "private time," sexually escalating touching, intimate conversation—were consistent with grooming behavior. The Government argued admission of the opinion testimony was proper under MRE 404(b) to prove Appellant's motive, intent, and scheme to have sex with Stacy.[20] The Defense argued that allowing such profile testimony invaded the fact-finding province of the members and was tantamount to impermissibly opining that Appellant "fit[ ] the profile of an offender."[21]

The military judge overruled the Defense objection, concluding the expert's testimony did not amount to profile evidence. Citing principally *United States v. Brooks*, 64 M.J. 325 (C.A.A.F. 2007), *United States v. Bresnahan*, 62 M.J. 137 (C.A.A.F. 2005), and *United States v. Huberty*, 53 M.J. 369 (C.A.A.F. 2000), he found it was permissible for the expert to testify that the evidence of Appellant's behavior was consistent with grooming behavior, so long as the expert did not opine that Appellant had in fact groomed Stacy, that he was a child sex abuser, or that child sex abuse occurred. He found such limited testimony regarding grooming was relevant and admissible as non-profile evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993), and MRE 403.

The military judge then allowed the Government to elicit the following testimony from the expert about "grooming" in its case-in-chief:

- That "instead of focusing on the victim's side of behaviors, it has to do with the offender's side of behaviors."[22]

- That "common patterns of grooming behavior" include cultivating a special relationship with the targeted victim, sharing special time together, giving gifts, lowering the child's inhibitions through innocuous or "quasi-sexual" touches, and then "escalating towards more progressively sexually explicit conduct."[23]

---

[19] R. at 723.

[20] As the Government had previously announced, its intention was to use evidence of Appellant's earlier acts with Stacy "to show a pattern of grooming behavior . . . leading up to . . . the penetrative act." R. at 22.

[21] R. at 730.

[22] R. at 773.

[23] R. at 775.

- That the evidence adduced at the court-martial revealed "behaviors that are consistent with common patterns of grooming," to include Appellant's relationship with Stacy, his role as "big brother" to her, the time he spent alone with her, taking car rides, going for ice cream, and his progression to more sexualized touching and actions.

The Government then drew from the expert's testimony in its closing argument, arguing that in connection with the charged offenses Appellant had been grooming Stacy.[24]

The Government expert's testimony was thus elicited and used in precisely the way the rule against profile testimony forbids. This was not an instance where, as in *Huberty*, expert testimony about grooming was used to explain the victim's behavior or to rebut issues in this area raised by a Defense expert. *See Huberty*, 53 M.J. at 373. Nor was it used as a means of explaining Stacy's complicity in the secret relationship with Appellant, thus supporting her credibility with respect to her delayed allegations. Rather, the testimony was "admitted for the purpose of showing that Appellant fit the 'profile' of a sex abuser." *Id.* at 373. It was elicited and used to show that Appellant's actions were consistent with patterns of grooming behavior exhibited by child sex abusers, in order to support the conclusion that he was guilty of the charged offense of child sexual abuse. The admission of this testimony was therefore erroneous.

*2. Prejudice*

Having found error, we test for prejudice. For non-constitutional evidentiary errors, the test for prejudice "is whether the error had a substantial influence on the findings." *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019) (internal quotation marks and citation omitted). In conducting this analysis, we weigh "(1) the strength of the Government's case, (2) the strength of the [D]efense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *Id.* (quoting *United States v. Norman*, 74 M.J. 144, 150 (C.A.A.F. 2015)).

Here, given Appellant's admissions that multiple sexual encounters with Stacy occurred, the Government's case was strong except for the timing of the offenses, which Appellant maintained occurred after Stacy turned 16. Even in regard to the timing of the offenses, as discussed above, there was strong corroborating evidence that at least one instance of sexual abuse occurred

---

[24] R. at 870-71, 878.

prior to the Appellant's deployment in February 2014 and, therefore, prior to Stacy's 16th birthday in mid-July 2014. The Defense case on the pre-deployment contact was weak by comparison, as it was focused principally on the timing issue, where the Government's case was weakest. In light of the evidence admitted, we find the expert testimony in question was not material to the timing issue for the strong, corroborated claim of pre-deployment sexual abuse. We therefore conclude the error in its admission did not have a substantial influence on the findings with respect to that instance, among the "divers occasions" charged.

On the other hand, we conclude the expert's testimony *was* material to the post-deployment sexual abuse Stacy testified about, because it corroborated the escalating nature of the sexual contact, which in turn supported Stacy's credibility on the issue of whether she was still 15 years old at the time. We find the quality of the testimony particularly important in this regard, as it came from an expert and thus lent the imprimatur of a scientific foundation to the Government's case. Accordingly, we conclude that Appellant was prejudiced as to any post-deployment sexual abuse and conclude that must be remedied by striking the words, "on divers occasions," from the specification, which we accomplish in our decretal paragraph.

## C. Legal and Factual Sufficiency

Appellant asserts the evidence is legally and factually insufficient to support his conviction. We review such questions de novo. UCMJ art. 66(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (citation and internal quotation marks omitted).

In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325 (C.M.A. 1987). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a "[r]easonable doubt, however,

does not mean the evidence must be free from conflict." *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

In order to prove the offense of sexual abuse of a child as charged, the Government was required to prove beyond a reasonable doubt that (1) Appellant committed sexual contact upon Stacy by intentionally touching, directly or through the clothing, her buttocks, thighs, hips, and back with his hand; (2) he did so with the intent to gratify his sexual desire; and (3) at the time Stacy had not attained the age of 16 years. *Manual for Courts-Martial, United States* (2016 ed.), pt. IV, para. 45.b.b.(4)(a).

The Government concedes the proof was lacking for the word, "hips," which is not supported by the evidence. After also removing the words, "on divers occasions," which we have concluded must be dismissed due to legal error, we find the remainder of the specification legally and factually sufficient. As discussed above, that Appellant touched Stacy's back, thighs, and buttocks for sexual gratification on at least one occasion prior to his deployment in February 2014 (well before her 16th birthday) was supported by not only Stacy's testimony, but also by the provocative emails Stacy sent to Appellant on his submarine, the family's knowledge of their one-on-one interactions, and Appellant's admissions to third parties. Considering the evidence in the light most favorable to the Prosecution, we conclude a reasonable fact-finder could have found all the essential elements of this offense beyond a reasonable doubt. The evidence is thus legally sufficient to support the conviction. Regarding factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we, too, are convinced of Appellant's guilt beyond a reasonable doubt.

**D. Sentence Reassessment**

Having set aside some of the language from the specification of which Appellant was convicted, we must determine whether we can reassess the sentence at the appellate level or whether we must remand for the trial court to do so. We do so by determining: (1) whether there have been dramatic changes in the penalty landscape or exposure; (2) whether sentencing was by members or a military judge alone; (3) whether the nature of the remaining offenses captures the gravamen of the criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses; and (4) whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial. *United States v. Winckelmann,* 73 M.J. 11, 15-16 (C.A.A.F. 2013).

Here, we determine that we can reassess the sentence. As Appellant remains convicted of one specification of sexual abuse of a child under Article 120b, there has been no change in the penalty landscape or exposure. However, excepting the words, "hips" and "on divers occasions," from the specification, while not changing the gravamen of his criminal conduct, does significantly alter the circumstances of the offenses relevant to sentencing, as it narrows the finding of criminal conduct to a single occasion. While Appellant was sentenced by members, the specification as modified deals with an offense of the type with which appellate judges have experience to reliably determine what sentence would have been imposed at trial. Under these circumstances, and excluding from our consideration the evidence we have found was erroneously admitted, we are confident that the sentence the members would have imposed for the specification as excepted would have been no less than three years' confinement and a dishonorable discharge. We affirm this reassessed sentence in our decretal paragraph.

**E. Sentence Recommendation in Unsworn Victim Impact Statement**

Appellant asserts the military judge erred in allowing Stacy to recommend a specific sentence. Because there was no objection at trial, we review for plain error, which occurs when there is an error, it is clear or obvious, and it results in material prejudice to a substantial right. *United States v. Powell*, 49 M.J. 460, 463-65 (C.A.A.F. 1998).

"[A] crime victim of an offense of which the accused has been found guilty has the right to be reasonably heard at the presentencing hearing relating to that offense." RCM 1001(c)(1). This right includes the right to make an unsworn statement including victim impact and matters in mitigation. RCM 1001(c)(3), (5). "[V]ictim impact" includes "any financial, social, psychological, or medical impact on the crime victim directly relating to or arising from the offense of which the accused has been found guilty." RCM 1001(c)(2)(B). However, the victim's statement "may not include a recommendation of a specific sentence." RCM 1001(c)(3).

During the presentencing hearing, Stacy made an unsworn victim impact statement in which she described the prolonged period Appellant's behavior had impacted her mental health and her relationship with her family. She concluded by stating, without objection from the Defense:

> I ask that as you come to your decision you keep this in mind: I suffered in silence for five years before circumstances made me tell the truth of what he had done to me. *I think that he needs a*

> *significant amount of jail time* to think about the pain he has
> put me through.[25]

The trial counsel then argued for a sentence that included five years' confinement. After deliberating an hour and a half, the members awarded a sentence that included five years' confinement.

We hold it was error for the military judge to allow Stacy to state, "I think [Appellant] needs a significant amount of jail time," because it constitutes a recommendation of a specific sentence. Our superior court held it improper to admit presentencing testimony opining that an accused has "[n]o potential for continued service," which it found was tantamount to saying "[g]ive the accused a punitive discharge." *United States v. Ohrt*, 28 M.J. 301, 305 (C.M.A. 1989). Similarly, opining that an accused "needs" a certain form of punishment is tantamount to recommending that the sentence include that form of punishment. To allow a victim to make such a recommendation is not in keeping with the framework for victim impact statements established under RCM 1001(c), which is designed to enable crime victims to tell the sentencing authority what impact the accused's misconduct has had on them, not what to do about it. Here, Stacy was allowed to tell the sentencing authority that from her perspective Appellant needed not just confinement, but a "significant amount" of it. Allowing her to make such a recommendation was clear, obvious error.

If an error occurs in the admission of evidence at sentencing, the test for prejudice is "whether the error substantially influenced the adjudged sentence." *United States v. Hamilton*, 78 M.J. 335, 343 (C.A.A.F. 2019) (citation omitted). We determine this by considering four factors: "(1) the strength of the Government's case; (2) the strength of the [D]efense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citation omitted).

Appellant asserts the members sentenced him to five years' confinement because Stacy's impact statement recommended significant jail time after stating she had suffered for five years because of what Appellant had done to her. We disagree. The trial counsel specifically asked for five years' confinement during the Government's sentencing argument. Based on the comparative strengths of the parties' sentencing cases, we do not find the unsworn impact statement to be so material or of such quality as to find that it substantially influenced the adjudged sentence. Even assuming it did, we con-

---

[25] R. at 976 (emphasis added).

clude our reassessment of the sentence in light of the language we set aside in the specification has purged the sentence of any possibility of such influence.

**F. Cumulative Error**

Finally, we address cumulative error. "It is well established that an appellate court can order a rehearing based on the accumulation of errors not reversible individually." *United States v. Flores*, 69 M.J. 366, 373 (C.A.A.F. 2011). "Courts are far less likely to find cumulative error where evidentiary errors are followed by curative instructions or when a record contains overwhelming evidence of a defendant's guilt." *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996). As we have found three errors that were not cured at trial, we ask whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error . . . ." *Banks*, 36 M.J. at 171 (quoting *United States v. Yerger*, 3 C.M.R. 22, 24 (C.M.A. 1952)) (internal quotation marks omitted).

Under the circumstances of this case, we conclude that the errors, taken together with our remedial actions, did not undermine the fairness or integrity of Appellant's trial such that we must set aside his conviction or sentence in toto. First, in striking the words "on divers occasions" from the specification, we have cleansed the finding of any prejudicial error associated with the MRE 513 issue or the profile testimony. As to the specification's remaining language, we find that as discussed above the record contains overwhelming evidence of Appellant's guilt. Hence, we hold that, "[a]s to the errors we found, we do not believe there is a reasonable probability that, taken cumulatively, those errors might have contributed to the conviction." *Flores*, 69 M.J. at 373. Second, in reassessing the sentence, we have cleansed it of any error associated with either the profile testimony or the victim impact statement. Accordingly, we can say with certainty that the cumulative effect of these errors has not affected the outcome of this case.

## III. CONCLUSION

We **SET ASIDE** and **DISMISS** the words, "hips," and "on divers occasions," from the specification. The findings as to the specification's remaining language and that portion of the sentence extending to a dishonorable discharge and three years' confinement are **AFFIRMED**.

Judges STEWART and HOUTZ concur.



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court